**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>LEEVERN JOHNSON and DAWN MARIE HEIDZIG,<br>Defendants. | No. CR05-4063-MWB<br>**REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS** |

## *I. INTRODUCTION*

This matter is before the court on a motion to suppress evidence filed jointly by the defendants Leevern Johnson and Dawn Marie Heidzig on June 29, 2005. (Doc. No. 19) The motion has been resisted by the plaintiff (the "Government"). (Doc. No. 26) Submission of the motion was delayed because, subsequent to the filing of the motion and the Government's resistance, new counsel was appointed to represent Defendant Johnson (*see* Doc. Nos. 28-30).

The defendants' motion came on for hearing before the undersigned on September 15, 2005. (*See* Doc. No. 9, assigning motions to suppress to the undersigned for consideration and preparation of report and recommendation.) At the hearing, Assistant U.S. Attorney Shawn Wehde appeared on behalf of the Government. Defendant Johnson was present in person with his attorney, Assistant Federal Defender Robert Wichser. Defendant Heidzig was present in person with her attorney, John P. Greer.

The Government offered the testimony of Iowa State Trooper C.J. Noelck; Cass County, Iowa, Sheriff's Deputy Darby Jason McLaren; and Tri-State Drug Task Force officer Brad Downing. The following exhibits were admitted into evidence: **Gov't Ex. 1** - videotape from Trooper Noelck's vehicle; **Gov't Ex. 2** - videotape from Deputy McLaren's vehicle; **Gov't Ex. 3** - consent to search form executed by Leevern Johnson. The defendants offered no testimony or exhibits.

The motion is now fully submitted and ready for consideration.

## *II. FACTUAL BACKGROUND*

On April 24, 2005, at about 7:30 a.m., Trooper Noelck was on patrol, traveling westbound on Interstate 80 in Cass County, Iowa, at about 55 miles per hour, when he was passed by a maroon 1992 Chevrolet Caprice station wagon. The Caprice appeared to have overly-tinted side windows.[1] The trooper ran a registration check on the Caprice's Iowa license plates and determined the plates were for a silver (not maroon) 1992 Chevrolet Caprice registered to a Maurice Johnson. He turned on his emergency lights and pulled the vehicle over to the side of the road to investigate the possible tint and registration violations.

When Trooper Noelck approached the vehicle, he determined it had four occupants, two in the front and two in the back. The trooper asked the driver (the defendant Leevern Johnson) for his driver's license, but Johnson stated he did not have

[1] Iowa Code section 321.438(b) provides: "A person shall not operate on the highway a motor vehicle equipped with a front windshield, a side window to the immediate right or left of the driver, or a side-wing forward of and to the left or right of the driver which is excessively dark or reflective so that it is difficult for a person outside the motor vehicle to see into the motor vehicle through the windshield, window, or sidewing." According to Trooper Noelck, this means the side windows should have no more than "factory tint," which allows in about 70% of the light. A later check of the side windows of the Caprice indicated they allowed in only 14% of the light.

his license with him. Johnson identified himself as Maurice Johnson (later determined to be his brother), and gave the trooper his brother's date of birth. He also gave the trooper registration and insurance information in the name of Maurice Johnson. With this information, the trooper found that Maurice Johnson had a valid Missouri driver's license, but Maurice Johnson was 6'8" tall and weighed 263 pounds. Leevern Johnson is about 5'8" tall, and appears to weight somewhat less than 263 pounds. Because of this discrepancy, the trooper was suspicious that the driver was not, in fact, Maurice Johnson.

Trooper Noelck brought Johnson back to his vehicle and questioned him about his identity, but Johnson continued to insist he was Maurice. Johnson provided the trooper with information about how long he had known the other occupants of the Caprice and about their travels. The trooper then questioned the other occupants of the Caprice, and they confirmed that the driver's name was Maurice, but they provided other information that conflicted with information Johnson had provided to the trooper, including how long they each had known Johnson and the details of their travels. This conflicting information increased Trooper Noelck's suspicions about Johnson's identity.

While these events were taking place, Deputy McLaren and another officer, Trooper Hoy, arrived in separate vehicles. Deputy McLaren parked his vehicle immediately behind Trooper Noelck's vehicle.

At 8:12 a.m., Trooper Noelck issued citations to "Maurice Johnson" for a window tint violation and for driving without a license. He also issued Johnson a warning for the registration violation and an equipment notice for the window tint violation. Johnson signed the tickets "Maurice Johnson." The trooper then asked Johnson for permission to search the Caprice, and Johnson gave both oral and written consent to a search of the vehicle and its contents. The written consent, which was for the vehicle "& contents," was signed by "Maurice Johnson" at 8:15 a.m.

Deputy McLaren activated the video/audio recording device in his vehicle, and placed two of the Caprice's occupants in his vehicle to await conclusion of the search – the defendant Dawn Heidzig, who had been sitting in the front passenger seat of the Caprice, and a man named Ellington, who had been sitting in the back seat. At least part of the reason Heidzig and Ellington were placed together in the vehicle with the recording device operating was to see if they would make any incriminating statements while left alone. The fourth occupant of the Caprice, a man named Nowden, was placed in Trooper Hoy's patrol car. The three officers then conducted an extensive search of the Caprice, but they found no evidence of the driver's identity or of any other criminal activity. The officers concluded the search at about 8:38 a.m.

Trooper Noelck continued to investigate Johnson's identity. He asked Johnson if he had ever been arrested, and Johnson responded that he had been arrested in Kansas City. Trooper Noelck contacted dispatch and arranged to have a booking photograph from the arrest faxed to a nearby sheriff's office. He told Johnson they could wait while Deputy McLaren drove to the sheriff's office to retrieve the photograph, or Johnson could follow the officers to the sheriff's office so he could be compared with the photograph. Johnson then admitted that he was Leevern Johnson, and Maurice Johnson was his brother. At about 8:50 a.m, Johnson was placed under arrest for signing the tickets using a false name and for lying to the trooper about his identity.

After Johnson's arrest, the investigation into Johnson's identity was concluded, so Heidzig, Ellington, and Nowden were free to leave. However, none of them had a valid driver's license. At about 9:00 a.m., Nowden asked for a ride to a nearby truck stop, and Trooper Hoy left with Nowden to take him to the truck stop. A tow truck was ordered for the Caprice, and Heidzig and Ellington sat in the Caprice to wait for the tow truck driver, who presumably would have given them a ride.

Meanwhile, Deputy McLaren listened to the recording of the conversation between Heidzig and Ellington in the back of his patrol car. Near the beginning of the recording, he thought he heard Ellington say, "What did you do with the shit?" or words to that effect, and he heard Heidzig respond, "Don't patrol vehicles have listening devices, tape recorders?" Deputy McLaren had Trooper Noelck listen to the tape to confirm what was on the recording.[2]

At about 9:06 a.m., Trooper Noelck and Deputy McLaren removed Ellington and Heidzig from the Caprice and questioned them separately. Trooper Noelck told Ellington what he had heard on the tape, and Ellington responded that Heidzig had drugs hidden in her pants. At the same time, Deputy McLaren told Heidzig, "I heard the tape, I know you're hiding something, I want it." Deputy McLaren assumed "it" was drugs. Heidzig said "it" was in her pants. The deputy took Heidzig to his vehicle, and told her to put the drugs on the floorboard of his car. She pulled a package of what appeared to be crack cocaine out of her pants and placed it on the floorboard. At about 9:08 a.m., she was placed under formal arrest. Upon questioning, Heidzig stated that when their vehicle was being pulled over, Johnson had told her to hide the drugs in her pants. She said she did so because she did not want to get into trouble.

Johnson was verbally advised of his *Miranda* rights at 9:11 a.m. Johnson and Heidzig were transported to the Cass County Jail. Johnson signed a written waiver of his *Miranda* rights at the jail at 10:08 a.m., and then gave Trooper Noelck and Deputy McLaren a statement regarding his involvement in the distribution of drugs. Heidzig was

[2] The court has listened to the recording, and while it is of poor quality and almost unintelligible, the court cannot find the officers were unreasonable in their interpretation of what they heard on the recording.

first *Mirandized* at 11:07 a.m., after she arrived at the jail, and she subsequently gave a statement to Trooper Noelck and Deputy McLaren about crack cocaine distribution.

The next morning, on April 25, 2005, three officers from the Tri-State Drug Task Force in Sioux City, Iowa, traveled to the Cass County Jail to interview Johnson and Heidzig. Heidzig again was advised of her *Miranda* rights. She signed a written waiver, and was interviewed for about 75 minutes. Then Johnson again was advised of his *Miranda* rights, signed a written waiver, and provided a statement to the officers.

## *III. LEGAL ANALYSIS*

It is difficult to perform a legal analysis of the defendants' claims because they are not identified clearly in their motion to suppress. Therefore, the court will go through the factual scenario presented in this case and determine whether, at each stage of the traffic stop and the ensuing questioning, any of the defendants' rights under the Fourth or Fifth Amendments were violated.

When Trooper Noelck observed the overly-tinted windows on the Caprice, he had a reasonable, articulable suspicion that a traffic violation had occurred, which gave him the right to pull the vehicle over to the side of the road. As the Eighth Circuit Court of Appeals recently stated:

> The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *See United States v. Fuse*, 391 F.3d 924, 927 ([8th Cir.] 2004). The United States Court of Appeals for the Eighth Circuit has held that a "traffic stop constitutes a 'seizure' within the meaning of the Fourth Amendment." *United States v. Martinez*, 358 F.3d 1005, 1009 (8th Cir. 2004), *quoted in Fuse*, 391 F.3d at 927. The validity of a traffic stop depends on the presence of "'at least

> a reasonable, articulable suspicion that criminal activity' has occurred or is occurring." *Fuse*, 391 F.3d at 927, *quoted in United States v. Jones*, 269 F.3d 919, 924 (8th Cir.2001). A violation of traffic laws establishes sufficient probable cause for law enforcement officers to stop a vehicle. *United States v. Barry*, 98 F.3d 373, 376 (8th Cir. 1996), *quoted in Fuse*, 391 F.3d at 927.

*United States v. Thurmond*, ___ F. 3d ___, 2005 WL 2216896 (8th Cir. Sept. 12, 2005).

After stopping the defendants' vehicle, Trooper Noelck was entitled to conduct a reasonable investigation of the vehicle's window tint, the condition that initially justified the stop. *Thurmond*, 2005 WL at *2 (citing *United States v. McCoy*, 200 F.3d 582, 584 (8th Cir. 2000) ("[O]fficers are 'entitled to conduct an investigation reasonably related in scope to the circumstances that initially' justified the stop."). The officer also was entitled to detain the vehicle's occupants while he completed "certain routine tasks, such as writing a citation and completing computerized checks of a driver's license, vehicle registration, and criminal history." *United States v. Fuse*, 391 F.3d 924, 927 (8th Cir. 2004). The trooper had the right to ask Johnson to sit in his patrol car while he conducted this investigation. *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002) ("An officer making a traffic stop does not violate the Fourth Amendment by asking the driver his destination and purpose, checking the license and registration, or requesting the driver to step over to the patrol car.") As the court held in *United States v. Barragan*, 379 F.3d 524 (8th Cir. 2004):

> Once the stop of a vehicle has occurred, a "police officer may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning." *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 647

> (8th Cir. 1999); *see also United States v. Brown*, 345 F.3d 574, 578 (8th Cir. 2003). "[I]f the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions." *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993). An officer may also question a vehicle's passengers to verify information provided by the driver, *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002), and conflicting stories may provide justification to expand the scope of the stop and detain the occupants. *Brown*, 345 F.3d at 578.

*Barragan*, 379 F.3d at 528-29.

The investigation of the window tint violation was concluded fairly quickly, but when Johnson was unable to provide a driver's license, Trooper Noelck was entitled to investigate this further violation, which included taking reasonable measures to confirm Johnson's identity. When Johnson provided a name and date of birth, and the trooper determined that his physical description did not match the description of the person whose name and date of birth Johnson had provided, the trooper was justified in continuing his investigation into Johnson's true identity. In fact, the questions about Johnson's identity, together with the conflicting stories given by the vehicle's other occupants about how long they had known each other and the details of their travels, justified a substantial expansion of the investigation flowing from the traffic stop.

> Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by looking at "the totality of the circumstances, in light of the officer's experience." *United States v. Dodson*, 109 F.3d 486, 488 (8th Cir. 1997). Though each factor giving rise to suspicion might appear to be innocent when viewed alone, a combination of factors may warrant further investigation when viewed together. *United States v. Bloomfield*, 40 F.3d 910, 918 (8th Cir. 1994) (en banc). An officer's suspicion of criminal activity may

> reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered. *See United States v. Morgan*, 270 F.3d 625, 631 (8th Cir. 2001); *[United States v.] Poulack*, 236 F.3d [932,] 936 [(8th Cir. 2001)]. *See also [United States v.] Barahona*, 990 F.2d [412,] 416 [(8th Cir. 1993)] ("[I]f the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.").

*Linkous*, 285 F.3d at 720. Not only were the officers justified in being suspicious of Johnson's true identity, they also were justified in being suspicious of the other occupants of the vehicle, who confirmed that suspicious identity.

As part of his continuing investigation, Trooper Noelck asked for, and obtained, both verbal and written consent to search the vehicle. Nothing in this record even remotely suggests Johnson's consent was coerced or involuntary. "A consensual search does not violate the Fourth Amendment if the consent was voluntarily given without coercion." *United States v. White*, 42 F.3d 457, 459 (8th Cir. 1994); *see United States v. Brown*, 345 F.3d 574, 579 (8th Cir. 2003).

Shortly after the search, Johnson admitted that he had provided the trooper with a false identity, and he was placed under arrest. The court specifically finds that detention of the defendants from the time the traffic stop began until the time of Johnson's arrest was reasonable in light of the officers' reasonable suspicions and the permissible scope of their ongoing investigation.

At the hearing, Trooper Noelck acknowledged that upon Johnson's arrest, his investigation was concluded and the vehicle's occupants, except for Johnson, were free to leave the scene.

> The conclusion of a traffic stop represents a watershed point in a law enforcement officer's interaction with an individual.

> Upon the conclusion of a traffic stop, which the Eight Circuit has defined as the point at which a ticket, warning, all-clear point, or other "objective indicia of the officer's intent" is presented, "the Fourth Amendment applies to limit any subsequent detention or search." *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 648 (8th Cir. 1999). An "officer cannot continue to detain a motorist after the initial stop is completed, unless the officer has 'a reasonably articulable suspicion for believing' criminal activity is afoot." [*United States v.*] *Fuse*, 391 F.3d [924,] 927 [8th Cir. 2004)] (quoting *United States v. Beck*, 140 F.3d 1129, 1134 (8th Cir. 1998)).

*Thurmond*, 2005 WL 2216896 at *2. One of the occupants left the scene of the stop, while Heidzig and another occupant waited for a ride from a tow truck.

Before Heidzig left the scene, however, the officers viewed the audio/video recording of her conversation with Ellington that suggested Heidzig was hiding something illegal on her person. Nothing prohibited Deputy McLaren from recording this conversation in his patrol car. *See United States v. Clark*, 22 F.3d 799, 802 (8th Cir. 1994) (holding, in an almost identical situation, that "a person does not have a reasonable or legitimate expectation of privacy in statements made to a companion while seated in a police car.") Based on this evidence, Deputy McLaren told Heidzig he knew she was hiding something, and he wanted it. Heidzig said "it" was in her pants. The deputy assumed she was referring to drugs. The deputy and Heidzig then walked over to the deputy's patrol car, and he told her to remove the item from her pants and drop it onto the floorboard of his vehicle. She pulled a packet of what appeared to be cocaine from her pants and dropped it onto the vehicle's floorboard. Heidzig was formally arrested at about 9:08 a.m., but she was not advised of her *Miranda* rights until she reached the jail, at 11:07 a.m.

No party has offered any authorities or persuasive argument regarding the nature of the exchange between Deputy McLaren and Heidzig that resulted in Heidzig removing the drugs from her pants and placing them in the deputy's patrol car. The court must consider whether the deputy's statement that he "wanted it," and his statement directing Heidzig to remove "it" from her pants and place "it" on the floorboard of his car, constituted pre-*Miranda*, custodial questioning in violation of Heidzig's Fifth Amendment rights. The first issue, then, is whether Heidzig was "in custody" at the time of Deputy McLaren's statements. "The *Miranda* protections are triggered only when a defendant is both in custody and being interrogated. *United States v. Hatten*, 58 F.3d 257, 261 (8th Cir. 1995) (citing *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir. 1992)).

> A suspect is considered "in custody" for *Miranda* purposes either when he has been formally arrested and not free to leave the location, or when a reasonable person in the suspect's position would have considered his freedom of movement restrained to a degree that is usually associated with a formal arrest. *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S. Ct. 3138, 3150, 82 L. Ed. 2d 317 (1984); *United States v. Goudreau*, 854 F.2d 1097, 1098 (8th Cir. 1988).

*United States v. Caldwell*, 954 F.2d 496, 499 (8th Cir. 1992).

In the present case, the court finds Heidzig was in custody for *Miranda* purposes. A reasonable person in Heidzig's position would have believed she was not free to leave at the time of Deputy McLaren's statements. *See United States v. Treadway*, 1997 WL 33560625 at *8-9 (N.D. Iowa Nov. 3, 1997) (Zoss, M.J.) (discussing indicia of custody in context of Report and Recommendation on defendant's motion to suppress).

The next issue is whether Heidzig's statement that "it" was in her pants, and her actions in removing the cocaine from her pants and placing it on the floorboard of the deputy's car, were in response to questioning. "[T]he special procedural safeguards

outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S. Ct. 1682, 1689, 64 L. Ed. 2d 297 (1980). The *Innis* Court defined "interrogation" for *Miranda* purposes as follows:

> "Interrogation," as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.
>
> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Innis*, 446 U.S. at 301-02, 100 S. Ct. at 1689-90 (emphasis by the Court; footnotes omitted); *accord United States v. Lockett*, 393 F.3d 834, 837-38 (8th Cir. 2005); *United States v. Bailey*, ___ F.3d ___, 2005 WL 1803520 at *3 (8th Cir. Aug. 2, 2005) ("The police may not speak or act in a manner that would be reasonably likely to elicit

incriminating responses from a person in custody who has not waived his Fifth Amendment rights." Citing *Innis*.)

Many statements made to suspects by officers do not rise to the level of interrogation. For example, factual statements to inform a suspect as to the status of her case, the charges against her, the investigation into her activities, and the like do not constitute an interrogation. *United States v. Hull*, 419 F.3d 762, 767 (8th Cir. 2005). "Whether a particular statement constitutes an interrogation depends upon the circumstances of each case[.]" *Id.* The present case differs from the majority of cases discussing the issue of what types of police statements or conduct constitute interrogation. Most of the cases on point arise from spontaneous statements by a suspect that either were not in response to any statement or question by a police officer, or were made following an officer's response to the suspect's question. *See, e.g.*, *Lockett*, *supra*; *United States v. Turner*, 157 F.3d 552, 556 (8th Cir. 1998); *United States v. Hull*, 419 F.3d 762, 767 (8th Cir. 2005). In the present case, Heidzig's statement that "it" was in her pants, and her actions in removing the cocaine from her pants and placing it on the floorboard of Deputy McLaren's vehicle, were in direct response to Deputy McLaren's statements. Indeed, her actions in removing the cocaine and placing it in the vehicle were in response to the deputy's demand that she do so.

Considering the totality of the circumstances, the court finds Heidzig's statement that "it" was in her pants, and her actions in removing the cocaine from her pants and placing it in the deputy's vehicle, were in direct response to interrogation. The deputy reasonably should have known his statement that he "wanted it," and his demand that she remove "it" from her pants and place it in his vehicle, would elicit an incriminating response. The interrogation was made prior to Heidzig being advised of her *Miranda*

rights, and therefore violated those rights. Her statement that "it" was in her pants should be suppressed.

This conclusion, however, does not settle the issue of whether the *fact* that Heidzig had the cocaine in her pants should be suppressed. The officers had heard Heidzig and Ellington talking, on the videotape, about concealing something from them. While Deputy McLaren was talking with Heidzig, Ellington informed Trooper Noelck that Heidzig had drugs hidden in her pants. With this information, the officers had probable cause to arrest Heidzig, *see United States v. Morales*, 238 F.3d 952, 953-54 (8th Cir. 2001) (officer must possess probable cause at the moment arrest is made; "probable cause may be 'based on the collective knowledge of all law enforcement officers involved in an investigation,'" quoting *United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993)), and as a result, Heidzig was under *de facto* arrest at the time Deputy McLaren was talking with her. *See United States v. Pratt*, 355 F.3d 1119, 1122-23 (8th Cir. 2004). Heidzig was subject to search incident to her arrest. *See United States v. Edwards*, 415 U.S. 800, 802-03 & n.3, 94 S. Ct. 1234, 1236-37 & n.3, 39 L. Ed. 2d 771 (1974) (lawful arrest "establishes the authority to search" and is exception to Fourth Amendment warrant requirement). Thus, the "search" of Heidzig was lawful, and the *fact* that cocaine was found in Heidzig's pants, and the cocaine itself, should not be suppressed.

As to suppression of the defendants' statements, the defendants have not identified many specific statements they made prior to the time they were advised of their *Miranda* rights. Johnson was arrested at 8:50 a.m. on April 24, 2005, and was first advised of his *Miranda* rights a few minutes later, at 9:11 a.m. To the extent he was questioned by the officers, and responded to those questions, between the time of his arrest and the time he was first advised of his rights, those responses should be suppressed. Notably, this does not include statements he made prior to his arrest, such as his misrepresentation of his

identity. The court specifically finds those statements were not made during a custodial interrogation, and Johnson's rights were not violated by the trooper's questions incident to the traffic stop and investigation of Johnson's identity.

Heidzig was formally arrested about 9:08 a.m. on April 24, 2005, but she was in custody, and under *de facto* arrest, at 9:06 a.m., when she was removed from the Caprice for questioning. She was first advised of her *Miranda* rights at 11:07 a.m. To the extent she was questioned by the officers and responded to those questions between the time she was removed from the Caprice for questioning and the time she received her advice of rights, those responses also should be suppressed

However, all statements made by Johnson and Heidzig after they were advised of their rights should not be suppressed. This is particularly true of the statements made to the Task Force officers on the following morning. Both defendants were advised of their rights again by the Task Force officers, and each defendant clearly waived those rights and agreed to talk with the officers. Their statements the next day were attenuated in time, took place at a different location from their arrest, and involved different officers, resulting in a break in the stream of events between their pre-*Miranda* statements and their statements to the Task Force officers. *See United States v. Nguyen*, 2000 WL 34033037 at *7-8 (N.D. Iowa Jan. 25, 2000) (Zoss, M.J.) (citing *Holland v. McGinnis*, 963 F.2d 1044, 1050-51 (7th Cir. 1992)).

## *IV. CONCLUSION*

For the reasons discussed above, **IT IS RECOMMENDED**, unless any party files objections to this Report and Recommendation as specified below, that the defendants' motion to suppress be **granted in part and denied in part**, consistent with this opinion.

Any party who objects to this report and recommendation must serve and file specific, written objections **by no later than September 28, 2005**. Any response to the objections must be served and filed **by no later than October 3, 2005.**

**If any party objects to this report and recommendation, that party must immediately order a transcript of all portions of the record the district court judge will need to rule on the objections.**

**IT IS SO ORDERED.**

**DATED** this 21st day of September, 2005.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT