**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>vs.<br><br>LEEVERN JOHNSON and DAWN MARIE HEIDZIG,<br><br>      Defendant. | No. CR05-4063-MWB<br><br>**ORDER REGARDING MAGISTRATE'S AMENDED REPORT AND RECOMMENDATION CONCERNING DEFENDANTS' MOTION TO SUPPRESS** |

_____

**TABLE OF CONTENTS**

*I.  INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A.  Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B.  Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*II.  LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   *A.  Standard Of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   *B.  Objections To Findings Of Fact* . . . . . . . . . . . . . . . . . . . . . . . . 9
      *1.  Basis for traffic stop* . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
      *2.  Review of tape recording* . . . . . . . . . . . . . . . . . . . . . . . . 10
      *3.  Defendant Johnson's consent to search the Caprice* . . . . . . . 11
      *4.  Time of arrest* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      *5.  End of traffic stop* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   *C.  Objections To Conclusions Of Law* . . . . . . . . . . . . . . . . . . . . . 13
      *1.  Basis for traffic stop* . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      *2.  Conflicting stories as basis to expand investigation* . . . . . . . 14
      *3.  Reason to be suspicious of Caprice's occupants* . . . . . . . . . 16
      *4.  Defendant Johnson's admission of real identity* . . . . . . . . . 17
      *5.  Search of defendant Heidzig* . . . . . . . . . . . . . . . . . . . . . 21

  6. *Defendants' statements* . . . . . . . . . . . . . . . . . . . . . . . . 22
  7. *Expectation of privacy in patrol car* . . . . . . . . . . . . . . . . 27

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# I. INTRODUCTION AND BACKGROUND

## A. Procedural Background

On May 17, 2005, an indictment was returned against defendants Leevern Johnson and Dawn Marie Heidzig, charging each with conspiracy to distribute and possess with intent to distribute 50 grams of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 846. Defendants filed a joint motion to suppress. In their motion, defendants seek to suppress statements and evidence seized following a traffic stop of the automobile in which defendants were traveling. Defendants' motion to suppress was referred to United States Magistrate Judge Paul A. Zoss, pursuant to 28 U.S.C. § 636(b). Judge Zoss conducted an evidentiary hearing and then filed an Amended Report and Recommendation in which he recommends that defendants' motion to suppress be granted in part and denied in part. Judge Zoss concluded that an Iowa State Patrol officer had probable cause to stop the automobile in which defendants were traveling to investigate a possible traffic violation based on the officer's observation of overly-tinted windows on the vehicle. Judge Zoss also concluded that because defendant Johnson was unable to

provide a driver's license or other form of identification to the state trooper, the trooper was entitled to extend the duration of the traffic stop in order to investigate defendant Johnson's identity. Next, Judge Zoss found that during this period of investigation that the trooper requested, and obtained, permission to search the vehicle. Judge Zoss further found that defendant Johnson admitted that he had provided the trooper with a false identity and that he was then arrested. In addition, Judge Zoss found that upon defendant Johnson's arrest the other occupants of the vehicle, including defendant Heidzig, were free to leave. Judge Zoss found that one of the occupants of the vehicle then left the scene of the stop, while Heidzig and another occupant waited for a ride from a tow truck. Judge Zoss found that it was during this period that law enforcement officers viewed an audio/video recording of a conversation that Heidzig had with another occupant of the stopped vehicle, while the two were sitting in the back of a patrol car, that suggested Heidzig was hiding something illegal on her person. Judge Zoss found that based on this recording, a law enforcement officer told Heidzig he knew she was hiding something, and he wanted it. Judge Zoss further found that Heidzig said "it" was in her pants and that the deputy and Heidzig then walked over to the deputy's patrol car, where he told her to remove the item from her pants and she complied with his order. Judge Zoss found that Heidzig was "in custody" at the time of the officer's statements to her and that Heidzig's statement in response and actions in removing the cocaine from her pants were done in response to law enforcement interrogation. Thus, Judge Zoss recommended suppression of Heidzig's statement to the officer. However, Judge Zoss further concluded that evidence of the cocaine should not be suppressed because Heidzig was under *de facto* arrest at the time and was subject to a search incident to arrest. Finally, Judge Zoss recommended suppressing any statements made by defendants between the time of their arrest and the time they were informed of their constitutional rights as required by

*Miranda v. Arizona*, 384 U.S. 436 (1966)

Defendants have filed objections to Judge Zoss's Amended Report and Recommendation. The court, therefore, undertakes the necessary review of Judge Zoss's recommended disposition of defendants' motion to suppress.

### B. Factual Background

In his Amended Report and Recommendation, Judge Zoss made the following findings of fact:

> On April 24, 2005, at about 7:30 a.m., Trooper Noelck was on patrol, traveling westbound on Interstate 80 in Cass County, Iowa, at about 55 miles per hour, when he was passed by a maroon 1992 Chevrolet Caprice station wagon. The Caprice appeared to have overly-tinted side windows. The trooper ran a registration check on the Caprice's Iowa license plates and determined the plates were for a silver (not maroon) 1992 Chevrolet Caprice registered to a Maurice Johnson. He turned on his emergency lights and pulled the vehicle over to the side of the road to investigate the possible tint and registration violations.
>
> When Trooper Noelck approached the vehicle, he determined it had four occupants, two in the front and two in the back. The trooper asked the driver (the defendant Leevern Johnson) for his driver's license, but Johnson stated he did not have his license with him. Johnson identified himself as Maurice Johnson (later determined to be his brother), and gave the trooper his brother's date of birth. He also gave the trooper registration and insurance information in the name of Maurice Johnson. With this information, the trooper found that Maurice Johnson had a valid Missouri driver's license, but Maurice Johnson was 6'8" tall and weighed 263 pounds. Leevern Johnson is about 5'8" tall, and appears to weight somewhat less than 263 pounds. Because of this discrepancy, the trooper was suspicious that the driver was not, in fact,

Maurice Johnson.

Trooper Noelck brought Johnson back to his vehicle and questioned him about his identity, but Johnson continued to insist he was Maurice. Johnson provided the trooper with information about how long he had known the other occupants of the Caprice and about their travels. The trooper then questioned the other occupants of the Caprice, and they confirmed that the driver's name was Maurice, but they provided other information that conflicted with information Johnson had provided to the trooper, including how long they each had known Johnson and the details of their travels. This conflicting information increased Trooper Noelck's suspicions about Johnson's identity.

While these events were taking place, Deputy McLaren and another officer, Trooper Hoy, arrived in separate vehicles. Deputy McLaren parked his vehicle immediately behind Trooper Noelck's vehicle.

At 8:12 a.m., Trooper Noelck issued citations to "Maurice Johnson" for a window tint violation and for driving without a license. He also issued Johnson a warning for the registration violation and an equipment notice for the window tint violation. Johnson signed the tickets "Maurice Johnson." The trooper then asked Johnson for permission to search the Caprice, and Johnson gave both oral and written consent to a search of the vehicle and its contents. The written consent, which was for the vehicle "& contents," was signed by "Maurice Johnson" at 8:15 a.m.

Deputy McLaren activated the video/audio recording device in his vehicle, and placed two of the Caprice's occupants in his vehicle to await conclusion of the search – the defendant Dawn Heidzig, who had been sitting in the front passenger seat of the Caprice, and a man named Ellington, who had been sitting in the back seat. At least part of the reason Heidzig and Ellington were placed together in the vehicle with the recording device operating was to see if they would make any incriminating statements while left alone. The fourth occupant of the Caprice, a man named Nowden,

was placed in Trooper Hoy's patrol car. The three officers then conducted an extensive search of the Caprice, but they found no evidence of the driver's identity or of any other criminal activity. The officers concluded the search at about 8:38 a.m.

Trooper Noelck continued to investigate Johnson's identity. He asked Johnson if he had ever been arrested, and Johnson responded that he had been arrested in Kansas City. Trooper Noelck contacted dispatch and arranged to have a booking photograph from the arrest faxed to a nearby sheriff's office. He told Johnson they could wait while Deputy McLaren drove to the sheriff's office to retrieve the photograph, or Johnson could follow the officers to the sheriff's office so he could be compared with the photograph. Johnson then admitted that he was Leevern Johnson, and Maurice Johnson was his brother. At about 8:50 a.m, Johnson was placed under arrest for signing the tickets using a false name and for lying to the trooper about his identity.

After Johnson's arrest, the investigation into Johnson's identity was concluded, so Heidzig, Ellington, and Nowden were free to leave. However, none of them had a valid driver's license. At about 9:00 a.m., Nowden asked for a ride to a nearby truck stop, and Trooper Hoy left with Nowden to take him to the truck stop. A tow truck was ordered for the Caprice, and Heidzig and Ellington sat in the Caprice to wait for the tow truck driver, who presumably would have given them a ride.

Meanwhile, Deputy McLaren listened to the recording of the conversation between Heidzig and Ellington in the back of his patrol car. Near the beginning of the recording, he thought he heard Ellington say, "What did you do with the shit?" or words to that effect, and he heard Heidzig respond, "Don't patrol vehicles have listening devices, tape recorders?" Deputy McLaren had Trooper Noelck listen to the tape to confirm what was on the recording.

At about 9:06 a.m., Trooper Noelck and Deputy McLaren removed Ellington and Heidzig from the Caprice and

questioned them separately. Trooper Noelck told Ellington what he had heard on the tape, and Ellington responded that Heidzig had drugs hidden in her pants. At the same time, Deputy McLaren told Heidzig, "I heard the tape, I know you're hiding something, I want it." Deputy McLaren assumed "it" was drugs. Heidzig said "it" was in her pants. The deputy took Heidzig to his vehicle, and told her to put the drugs on the floorboard of his car. She pulled a package of what appeared to be crack cocaine out of her pants and placed it on the floorboard. At about 9:08 a.m., she was placed under formal arrest. Upon questioning, Heidzig stated that when their vehicle was being pulled over, Johnson had told her to hide the drugs in her pants. She said she did so because she did not want to get into trouble.

Johnson was verbally advised of his *Miranda* rights at 9:11 a.m. Johnson and Heidzig were transported to the Cass County Jail. Johnson signed a written waiver of his *Miranda* rights at the jail at 10:08 a.m., and then gave Trooper Noelck and Deputy McLaren a statement regarding his involvement in the distribution of drugs. Heidzig was first *Mirandized* at 11:07 a.m., after she arrived at the jail, and she subsequently gave a statement to Trooper Noelck and Deputy McLaren about crack cocaine distribution.

The next morning, on April 25, 2005, three officers from the Tri-State Drug Task Force in Sioux City, Iowa, traveled to the Cass County Jail to interview Johnson and Heidzig. Heidzig again was advised of her *Miranda* rights. She signed a written waiver, and was interviewed for about 75 minutes. Then Johnson again was advised of his *Miranda* rights, signed a written waiver, and provided a statement to the officers.

Amended Report and Recommendation at pp. 2-6 (footnotes omitted). Upon review of the record, the court adopts all of Judge Zoss's factual findings that have not been objected to by defendants.

## II. LEGAL ANALYSIS

### A. Standard Of Review

Pursuant to statute, this court's standard of review for a magistrate judge's report and recommendation is as follows:

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge].

28 U.S.C. § 636(b)(1). Similarly, Federal Rule of Civil Procedure 72(b) provides for review of a magistrate judge's report and recommendation on dispositive motions and prisoner petitions, where objections are made, as follows:

> The district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

FED. R. CIV. P. 72(b). 

The Eighth Circuit Court of Appeals has repeatedly held that it is reversible error for the district court to fail to conduct a *de novo* review of a magistrate judge's report where such review is required. *See, e.g., Hosna v. Groose*, 80 F.3d 298, 306 (8th Cir.) (citing 28 U.S.C. § 636(b)(1)), *cert. denied*, 519 U.S. 860 (1996); *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (citing *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994)); *Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995) (also citing *Belk*). As noted above, defendants have filed objections to Judge Zoss's Amended Report and

Recommendation. The court, therefore, undertakes the necessary review of Judge Zoss's recommended disposition of defendants' motion to suppress.

## B. Objections To Findings Of Fact

### 1. Basis for traffic stop

Defendants initially object to the following finding by Judge Zoss:

> Trooper Noelck was on patrol, traveling westbound on Interstate 80 in Cass County, Iowa, at about 55 miles per hour, when he was passed by a maroon 1992 Chevrolet Caprice station wagon. The Caprice appeared to have overly-tinted side windows. The trooper ran a registration check on the Caprice's Iowa license plates and determined the plates were for a silver (not maroon) 1992 Chevrolet Caprice registered to a Maurice Johnson.

Amended Report and Recommendation at 2. Defendants assert that Trooper Noelck stopped the vehicle in which they were traveling primarily to investigate the tint of the windows of the automobile. Defendants further assert that Trooper Noelck had no reason to believe that the windows on the Caprice were in violation of Iowa law.

Trooper Noelck testified that he stopped the Caprice in which defendants were traveling for two separate reasons. Trooper Noelck testified that he noticed when the Caprice passed his patrol car that it appeared to have window tint in excess of that permitted under Iowa law.[1] Specifically, Trooper Noelck testified that: "I could barely

---

[1]Iowa Code section 321.438(b) provides that:

> A person shall not operate on the highway a motor vehicle equipped with a front windshield, a side window to the immediate right or left of the driver, or a side-wing forward of

(continued...)

see a silhouette of a driver in the vehicle. The windows were that dark." Tr. at 18. Trooper Noelck further testified that when he ran a registration check on the Caprice after it passed him, that check revealed that the registration was for a silver Caprice and the car that passed him was a maroon Caprice. Tr. at 19. Based on his observations of the darkly tinted windows and the discrepancy in the vehicle's registration, Trooper Noelck stopped the Caprice in which defendants were traveling in order to investigate these possible violations of Iowa law. Therefore, this objection is denied.

### 2.    *Review of tape recording*

Defendants next object to Judge Zoss's finding that Deputy McLaren had Trooper Noelck listen to the tape recording of the conversation between defendant Heidig and Ellington which was recorded while the two were in the back of Deputy McLaren's patrol car. Defendants challenge this factual finding because Judge Zoss found the tape recording to be "almost unintelligible." Amended Report and Recommendation at 5 n.2. What Judge Zoss actually concluded was as follows: "The court has listened to the recording, and while it is of poor quality and almost unintelligible, the court cannot find the officers were unreasonable in their interpretation of what they heard on the recording." Amended Report and Recommendation at 5 n.2. The court's own review of the tape recording leads it to the reach the same conclusion. Therefore, this objection is denied.

---

[1](...continued)

> and to the left or right of the driver which is excessively dark or reflective so that it is difficult for a person outside the motor vehicle to see into the motor vehicle through the windshield, window, or sidewing.

IOWA CODE § 321.438(b).

### 3.     *Defendant Johnson's consent to search the Caprice*

Defendant Johnson next objects to Judge Zoss's finding that "Johnson gave both oral and written consent to a search of the vehicle and its contents." Amended Report and Recommendation at 3. Defendant Johnson asserts that the record does not support the contention that he gave oral consent for a search of the contents of the Caprice. In addition, defendant Johnson asserts that the word, "contents," was not legibly written on the consent to search form that he signed.

The court notes that a written consent to search form was signed by defendant Johnson. The consent to search form indicates that it gives the trooper permission to search both the Caprice as well as its contents. Although the word "contents" could have been written with more clarity, it is far from illegible. Thus, the court concludes that the written consent form clearly identifies the subjects of the search.

The court has reviewed the recording of the exchange between defendant Johnson and Trooper Noelck and concludes that Trooper Noelck asked for permission to search both the Caprice as well as its contents. Defendant Johnson then gave oral permission to search both the Caprice as well as its contents. Therefore, these objections are also denied.

### 4.     *Time of arrest*

Defendants also object to Judge Zoss's finding that: "At about 8:50 a.m, Johnson was placed under arrest for signing the tickets using a false name and for lying to the trooper about his identity." Amended Report and Recommendation at 4. Defendants contend that the record shows that the Caprice was stopped at 7:30 a.m. and that Trooper Noelck issued citations to Johnson, for excessive window tint, not having a driver's license and a warning ticket for a registration violation, at 8:12 a.m.

Defendants recitation of the time that events occurred is accurate but does not indicate a factual error by Judge Zoss. Judge Zoss specifically noted that it was at "about

7:30 a.m." when Trooper Noelck turned on his emergency lights and pulled the Caprice over to investigate the possible tint and registration violations. Amended Report and Recommendation at 2. Judge Zoss also found that: "At 8:12 a.m., Trooper Noelck issued citations to 'Maurice Johnson' for a window tint violation and for driving without a license. He also issued Johnson a warning for the registration violation and an equipment notice for the window tint violation." Amended Report and Recommendation at 3. The record clearly indicates that after Trooper Noelck issued the traffic citations to defendant Johnson, for the window tint violation and driving without a license, Trooper Noelck continued to investigate defendant Johnson's identity due to the discrepancy between his physical appearance and the physical description of the individual defendant Johnson claimed to be, Maurice Johnson. This investigation continued until defendant Johnson, when faced with the possibility of photographic identification, conceded that Maurice Johnson was his brother and that he was Leevern Johnson. It was at this juncture that defendant Johnson was placed under arrest for providing the officers with a false identity and for signing the tickets using this false identity. This arrest occurred at approximately 8:50 a.m. Therefore, this objection is also denied.

### 5. *End of traffic stop*

Defendants further object that Judge Zoss did not find that after issuing the traffic citations at 8:12 a.m., the traffic stop ended. The court concludes that the traffic stop in this case was not concluded until defendant Johnson was placed under arrest for providing the officers with a false identity and for signing the tickets using this false identity. Defendant Johnson was questioned at the same location where he was stopped in order to verify or dispel Trooper Noelck's suspicions about the identity Johnson had given to Trooper Noelck. Trooper Noelck diligently pursued a means of investigation that was likely to confirm or dispel his suspicions as quickly as possible. This culminated in

defendant Johnson conceding that he had given Trooper Noelck his brother's name and information at the time he was initially stopped. It was only after defendant Johnson was placed under arrest for providing the officers with a false identity and for signing the tickets using this false identity, at approximately 8:50 a.m., that the traffic stop was concluded and the three other occupants of the car were free to leave. Therefore, this objection is also denied.

## C. Objections To Conclusions Of Law

### 1. Basis for traffic stop

Defendants object to Judge Zoss's legal conclusion that: "When Trooper Noelck observed the overly-tinted windows on the Caprice, he had a reasonable, articulable suspicion that a traffic violation had occurred, which gave him the right to pull the vehicle over to the side of the road." Amended Report and Recommendation at 6. As the court indicated above, Trooper Noelck testified that he stopped the Caprice in which defendants were traveling for two separate reasons: his observations of the darkly tinted windows in the Caprice as well as the discrepancy in the vehicle's registration. The Eighth Circuit Court of Appeals has observed that "'[i]t is well established that a traffic violation--however minor--creates probable cause to stop the driver of a vehicle.'" *United States v. Barry*, 98 F.3d 373, 376 (8th Cir. 1996) (quoting *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993)), *cert. denied*, 519 U.S. 1140 (1997); *United States v. Blaylock*, 421 F.3d 758, 767 (8th Cir. 2005); *United States v. Ehrmann*, 421 F.3d 774, 780 (8th Cir. 2005); *United States v. Sanchez*, 417 F.3d 971, 974 (8th Cir. 2005); *United States v. Beck*, 140 F.3d 1129, 1133 (8th Cir. 1998); *United States v. Hamby*, 59 F.3d 99, 101 (8th Cir.1995); *United States v. Johnson*, 58 F.3d 356, 357 (8th Cir.), *cert. denied*, 516 U.S. 936 (1995); *United States v. Halls*, 40 F.3d 275, 276 (8th Cir. 1994), *cert.*

*denied*, 514 U.S. 1076 (1995). Here, Trooper Noelck's observation of the darkly tinted windows on the Caprice provided him with at most probable cause and no less than reasonable suspicion to believe that the Caprice's windows had an excessive tint, in violation of Iowa law, justifying stop of the vehicle. *See United States v. Harrell*, 268 F.3d 141, 148 (2nd Cir. 2001) (holding that where an objectively reasonable police officer would have suspected that windows on defendant's car were tinted in violation of state traffic law, officers had probable cause under the Fourth Amendment to stop the car); *see also United States v. Ramirez*, 86 Fed. Appx. 384, 384 (10th Cir. 2004) (holding that Utah Highway Patrol officer's observation of defendant's vehicle provided him with reasonable suspicion to believe that vehicle's windows had an excessive tint which justified officer's stopping of the vehicle); *United States v. Roberts*, 77 Fed. Appx. 561, 562 (3rd Cir. 2004) (holding that stop of vehicle was "plainly lawful" where officer had reasonable cause to believe that the car violated Pennsylvania law against excessively tinted windows). Thus, the court concludes that the initial stop of Johnson's automobile was lawful in this case. Therefore, this objection is denied.

## 2. *Conflicting stories as basis to expand investigation*

Defendants next object to Judge Zoss's legal conclusion that the conflicting stories given by the Caprice's occupants, other than Johnson, justified a substantial expansion of the investigation flowing from the traffic stop. The court notes that this objection misstates Judge Zoss's legal conclusion. Judge Zoss found as follows:

> When Johnson provided a name and date of birth, and the trooper determined that his physical description did not match the description of the person whose name and date of birth Johnson had provided, the trooper was justified in continuing his investigation into Johnson's true identity. In fact, the questions about Johnson's identity, together with the conflicting stories given by the vehicle's other occupants about

> how long they had known each other and the details of their
> travels, justified a substantial expansion of the investigation
> flowing from the traffic stop.

Amended Report and Recommendation at 8.

The Eighth Circuit Court of Appeals has instructed that generally, when a law
enforcement officer makes a traffic stop,

> The Fourth Amendment grants an officer conducting a routine
> traffic stop latitude to check the driver's identification and
> vehicle registration, ask the driver to step out of his vehicle
> and over to the patrol car, inquire into the driver's destination
> and purpose for the trip, and "undertake similar questioning of
> the vehicle's occupants to verify the information provided by
> the driver."

*United States v. Gregory*, 302 F.3d 805, 809 (8th Cir. 2002)(quoting *United States v.
Linkous*, 285 F.3d 716, 719 (8th Cir. 2002)). The scope of an investigation following a
traffic stop may be expanded beyond these initial actions. As the Eighth Circuit Court of
Appeals has explained:

> Whether an officer has reasonable suspicion to expand the
> scope of a traffic stop is determined by looking at "the totality
> of the circumstances, in light of the officer's experience."
> *United States v. Dodson,* 109 F.3d 486, 488 (8th Cir. 1997).
> Though each factor giving rise to suspicion might appear to be
> innocent when viewed alone, a combination of factors may
> warrant further investigation when viewed together. *United
> States v. Bloomfield,* 40 F.3d 910, 918 (8th Cir. 1994) (en
> banc). An officer's suspicion of criminal activity may
> reasonably grow over the course of a traffic stop as the
> circumstances unfold and more suspicious facts are uncovered.
> *See United States v. Morgan,* 270 F.3d 625, 631 (8th Cir.
> 2001); *[United States v.] Poulack,* 236 F.3d [932,] 936 [(8th
> Cir. 2001)]. *See also [United States v.] Barahona,* 990 F.2d

15

[412,] 416 [(8th Cir. 1993)] ("[I]f the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.").

*Linkous*, 285 F.3d at 720.

Here, given that the officers were confronted by a driver without a driver's license or any other form of identification, the officers were permitted to expand the investigation in order to clarify defendant Johnson's identification. The identification information that defendant Johnson supplied to Trooper Noelck did not resolve matters but further complicated them since the information that Johnson supplied to Trooper Noelck came back to an individual whose physical characteristics did not match those of Johnson. To further complicate matters, when the passengers of the Caprice were individually questioned, the passengers gave answers which contradicted the information that Johnson had given to Trooper Noelck.

Because the responses of the Caprice's occupants and the circumstances gave rise to suspicions unrelated to the traffic offense, the officers were permitted to broaden their inquiry in order to satisfy those suspicions. *Gregory*, 302 F.3d at 809 (citing *Barahona*, 990 F.2d at 416). Thus, the court concludes that Judge Zoss correctly found that because of Trooper Noelck's reasonable suspicions unrelated to the traffic offense, Trooper Noelck was entitled to broaden his inquiry to satisfy those suspicions. Therefore, this objection is also denied.

### 3.    *Reason to be suspicious of Caprice's occupants*

Defendants further object to Judge Zoss's finding that the officers were justified in being suspicious of defendant Johnson and the Caprice's other occupants. As with many of defendants' objections, defendants do not identify why this conclusion is allegedly in error. The court's own review of the record reveals no error. Trooper Noelck was

confronted by a driver without any form of photographic identification. When Johnson provided Trooper Noelck with a name and date of birth, Trooper Noelck determined that his physical description did not match the description of the person whose name and date of birth had been provided. Thus, the court concludes that the officers were rightly suspicious of Johnson. Moreover, the officers also had reason to be suspicious of the other occupants of the Caprice since the other three individuals gave conflicting stories about how long they had known each other and the details of their travels. Therefore, this objection is also denied.

### 4. Defendant Johnson's admission of real identity

Defendants next object to Judge Zoss's finding that shortly after the search, Johnson admitted that he had provided the trooper with a false identity and that "detention of the defendants from the time the traffic stop began until the time of Johnson's arrest was reasonable in light of the officers' reasonable suspicions and the permissible scope of their ongoing investigation." Amended Report and Recommendation at 9. Again, defendants do not identify why this conclusion is allegedly in error. Defendants also assert that defendant Johnson's admission that he had provided the officers with a false identity was the product of custodial interrogation.

For the reasons already detailed above, the court agrees with Judge Zoss's conclusion that the detention of the defendants from the time the traffic stop began until the time of Johnson's arrest was reasonable.

Defendants also argue that the court should suppress Johnson's admission that he had provided the officers with a false identity because the admission of his inculpatory remarks violated his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). In order for Johnson to make out a claim under *Miranda*, however, his statements must have been the product of custodial interrogation. *Id*. at 444 ("[T]he prosecution may not use statements

. . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."). The protections of *Miranda* extend beyond actual questioning by the police to include the "functional equivalent" of interrogation, meaning "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). As the Eighth Circuit Court of Appeals has observed:

> Interrogation refers not only to express questioning but also to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect. *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed.2d 297 (1980). Interrogation must also reflect a measure of compulsion above and beyond that inherent in custody itself. *See id.* at 300, 100 S. Ct. 1682. Thus, not all statements made while in custody are the product of interrogation. *See United States v. Hatten*, 68 F.3d 257, 262 (8th Cir.1995). In determining whether a statement is the product of interrogation, the focus is on [the defendant's] perceptions of [the law enforcement officer's] behavior at the time the conversation took place. *See Boykin v. Leapley*, 28 F.3d 788, 792 (8th Cir. 1994).

*Holman v. Kemna*, 212 F.3d 413, 418 (8th Cir. 2000), *cert. denied*, 531 U.S. 1021 (2000).

In *Berkemer v. McCarty*, 468 U.S. 420 (1984), the United States Supreme Court considered "whether the roadside questioning of a motorist detained pursuant to a routine traffic stop should be considered 'custodial interrogation'" for purposes of *Miranda*. *Berkemer*, 468 U.S. at 435. Although such a stop "significantly curtails the 'freedom of action' of the driver and the passengers," *id.* at 436, the Court held that "persons

temporarily detained pursuant to [ordinary traffic] stops are not 'in custody' for the purposes of *Miranda*" due to the "noncoercive" nature of such stops. *Id*. at 440. Specifically, the Court found two characteristics of routine traffic stops that "mitigate the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely.'" *Id*. at 437 (quoting *Miranda*, 384 U.S. at 467). First, unlike a station house interrogation, the detentions are "presumptively temporary and brief." *Id*. at 437. Second, such detentions share the characteristics of occurring in public and of being less police dominated, reducing the potential that police will use improper methods to elicit self-incriminating statements and diminishing the suspect's fear that lack of cooperation will be met with abuse. *See id*. at 438-39. Such detentions, the Court held, are similar to investigative stops pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). *Berkemer*, 468 U.S. at 439. As the Fourth Circuit Court of Appeals has cogently pointed out: "'[T]he person detained is not technically free to leave while the officer pursues the investigation,'" but "*Terry* stops differ from custodial interrogation in that they must last no longer than necessary to verify or dispel the officer's suspicion." *United States v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995) (quoting *United States v. Manbeck*, 744 F.2d 360, 376-77 (4th Cir. 1984)). The Court, however, refused to adopt a bright-line rule that *Miranda* warnings are never required during *Terry* stops or routine traffic stops. On the contrary, the Court specifically noted that "the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest,'" and "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Berkemer*, 468 U.S. at 440 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not

on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). Thus, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442. If, however, an officer's views or beliefs are manifested to the suspect under interrogation and would have affected how a reasonable man would have understood his situation, they become factors to consider. *See Stansbury*, 511 U.S. at 325; *Berkemer*, 468 U.S. at 441-42. Thus, in *Berkemer*, the Supreme Court determined that the suspect was not in custody during the short period of time between his detention and arrest in part because the suspect was not informed that his detention would be other than temporary. *Berkemer*, 468 U.S. at 441-42.

Here, whether the traffic stop had evolved into a custodial interrogation when Johnson made his admission depends upon whether all the facts and circumstances would have led a reasonable person to believe that the detention was not temporary and that he would not soon be free to leave. *See Berkemer*, 468 U.S. at 437-42. The court concludes that this routine traffic stop did not evolve into custodial interrogation when defendant Johnson was told by Trooper Noelck that he had arranged for a booking photograph of "Maurice Johnson" to be faxed to a nearby sheriff's office. He simply told Johnson they could wait while Deputy McLaren drove to the sheriff's office to retrieve the photograph, or Johnson could follow the officers to the sheriff's office so he could be compared with the booking photograph. Under these circumstances, a reasonable person would not believe that he was in custody. Since Johnson was not in custody for purposes of *Miranda* at the time of his admission that he had provided the officers with a false identity, his admission is not subject to suppression. Therefore, this objection is also denied.

### 5. *Search of defendant Heidzig*

Defendants further object to Judge Zoss's conclusion that the search of defendant Heidzig was lawful and that the cocaine found in her pants should not be suppressed. Defendants yet again fail to articulate the basis for why they believe this conclusion is allegedly in error. Judge Zoss concluded that defendant Heidzig was under *de facto* arrest at the point that the drugs were recovered from her and that she was therefore subject to a search incident to arrest and that such a search would inevitably have led to the discovery of the drugs she had hidden on her person. The court concurs in this conclusion.

Although Judge Zoss did not specifically identify the inevitable discovery doctrine adopted by the Supreme Court in *Nix v. Williams*, 467 U.S. 431 (1984), it is clear from his Amended Report and Recommendation that the inevitable discovery doctrine was the basis for his decision. The inevitable discovery doctrine is an exception to the general rule requiring exclusion of evidence that is the result of unlawful government conduct. Evidence found as a result of illegal police conduct that inevitably would have been lawfully discovered absent the illegal conduct need not be suppressed. *Nix*, 467 U.S. at 440-44. The inevitable discovery doctrine is based on the rationale that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been if no police error or misconduct had occurred." *Id*. at 443. When the challenged evidence would inevitably have been discovered by independent lawful means, exclusion of the evidence "would put the police in a worse position than they would have been in absent any error or violation." *Id*. In this case, but for Deputy McLaren directing her to put the drugs on the floorboard of his patrol car, Trooper Noelck would have arrested her based on the information he obtained from Ellington that Heidzig had drugs in her pants and a search incident to that arrest

would have uncovered the drugs. Thus, under the inevitable discovery doctrine the drugs found on defendant Heidzig are not subject to suppression. Therefore, this objection is also denied.

### 6. *Defendants' statements*

Defendants next object to Judge Zoss's conclusion that "all statements made by Johnson and Heidzig after they were advised of their rights should not be suppressed." Amended Report and Recommendation at 15. Once again, defendants fail to explain why they deem this conclusion to be erroneous. Defendants further object to Judge Zoss's failure to suppress statements made in letters written by defendants while in custody at the Cass County Jail. Defendants assert that these statements must all be suppressed as "fruit of the poisonous tree" and direct the court to the Supreme Court's decision in *United States v. Wong Sun*, 371 U.S. 471 (1963).

The issue here is whether the warnings administered to defendant Heidzig at the Cass County Jail could be effective to safeguard his rights. This question arises because of the Supreme Court's decision in *Missouri v. Seibert*, 124 S. Ct. 2601 (2004). There, the Supreme Court addressed the practice of police interrogation of suspects in successive unwarned and warned phases. *Seibert*, 124 S.Ct. at 2609. The plurality in *Seibert* held unconstitutional a two-part interrogation, suppressing statements made both before and after a suspect was administered *Miranda* warnings. The first round consisted of questioning where *Miranda* warnings were intentionally withheld. Once the suspect had made incriminating statements, she was administered warnings. She thereupon waived her *Miranda* rights, and her interrogator took her back through her incriminating statements. The Court thought that "this question-first tactic effectively threatens to thwart *Miranda's* purpose of reducing the risk that a coerced confession would be admitted." *Seibert*, 124 S. Ct. at 2613. The Court instructed that: "The threshold issue when interrogators

question first and warn later is [ ] whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Id.* at 2610. The Supreme Court had addressed similar situations in the past. In *Oregon v. Elstad*, 470 U.S. 298 (1985), the police went to the suspect's house to arrest him for a burglary. While in the house, one officer asked Elstad why he thought he was being arrested while the other explained to Elstad's mother that Elstad was a robbery suspect. Elstad answered the officer that he knew the owners of the home in which the burglary had occurred, and added that he knew the house was robbed, and that he had been at the robbery. The Supreme Court thought that this "brief" encounter, which only occurred because the officer's partner wanted to explain the situation to Elstad's mother, did not remove Elstad's ability to later confess to the crime. *Elstad*, 470 U.S. at 315. Elstad subsequently confessed an hour later at the police station, after warnings were administered. *Id.* at 301. The Court found that failure to administer *Miranda* warnings to Elstad at the house was an oversight. *Id.* at 315. The Court concluded that subsequent *Miranda* warnings would ordinarily lead to a presumption that statements made after those warnings were voluntary. *Id.* at 315.

In *Seibert*, the police intentionally deprived the defendant of *Miranda* warnings. *Seibert*, 124 S. Ct. at 2606. Seibert was questioned at the police station for 30 to 40 minutes without warnings until she confessed. After being given a 20 minute coffee break, Seibert was administered warnings, again asked the same questions at which time she made the same admission. *Id.* The Court had to distinguish the questioning Seibert endured from that in *Elstad* because in *Elstad*, the Court noted that:

> a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and

informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Elstad*, 470 U.S. at 309.

The Court in *Elstad* held "that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings." *Id.* at 318. In *Seibert*, the plurality pointed out that:

Although the *Elstad* Court expressed no explicit conclusion about either officer's state of mind, it is fair to read *Elstad* as treating the living room conversation as a good-faith *Miranda* mistake, not only open to correction by careful warnings before systematic questioning in that particular case, but posing no threat to warn-first practice generally.

*Seibert*, 124 S. Ct. at 2612. The *Seibert* plurality contrasted its conclusion with the Court's holding in *Elstad*:

In a sequential confession case, clarity is served if the later confession is approached by asking whether in the circumstances the *Miranda* warnings given could reasonably be found effective. If yes, a court can take up the standard issues of voluntary waiver and voluntary statement; if no, the subsequent statement is inadmissible for want of adequate *Miranda* warnings, because the earlier and later statements are realistically seen as parts of a single, unwarned sequence of questioning.

*Seibert*, 124 S.Ct. at 2610 n. 4. The Court went on to identify

a series of relevant facts that bear on whether Miranda warnings delivered midstream could be effective enough to

accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Seibert*, 124 S.Ct. at 2612.

Five justices agreed that warnings given midstream may be ineffective to safeguard the rights of a questioned suspect. *Seibert*, 124 S. Ct. at 2613 ("Because the question-first tactic effectively threatens to thwart *Miranda's* purpose of reducing the risk that a coerced confession would be admitted, and because the facts here do not reasonably support a conclusion that the warnings given could have served their purpose, Seibert's postwarning statements are inadmissible"). Justice Kennedy concurred in the result, but insisted on "a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Seibert*, 124 S. Ct. at 2616 (Kennedy, J., concurring). Justice Kennedy concluded that

[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning and of the Miranda waiver. For example, a substantial break in time and circumstances between the prewarning statement and the Miranda warning may suffice in most circumstances, as it allows the accused to distinguish the

two contexts and appreciate that the interrogation has taken a
new turn.

*Id.*

The Court's decision in *Seibert* must be read in accord with *Marks v. United States*,
430 U.S. 188 (1977), in which the Court instructed: "When a fragmented Court decides
a case and no single rationale explaining the result enjoys the assent of five Justices, 'the
holding of the Court may be viewed as that position taken by those Members who
concurred in the judgments on the narrowest grounds.'" *Marks*, 430 U.S. at 193 (quoting
*Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976).

The Eighth Circuit Court of Appeals has held that it applies a multi-factor test
derived from the Court's plurality opinion in *Seibert*. *See United States v. Fellers*, 397
F.3d 1090, 1098 (8th Cir.), *cert denied*, 2005 WL 2493862 (2005). In *Fellers*, the court
of appeals instructed:

> We consider: (1) the extent of the first round of interrogation;
> (2) the extent to which the first and second rounds of
> interrogation overlap; (3) the timing and setting of both
> questioning sessions, including whether a continuity of police
> personnel existed; and (4) the extent to which the
> interrogator's questions treated the second round as continuous
> with the first.

*Id.* at 1098.

Here, the facts are much closer to the facts at issue in *Elstad* than to the facts at
issue in *Seibert*. As in *Elstad*, the unwarned conversation was relatively brief. Moreover,
a different officer elicited the statements from Heidzig along the highway than conducted
her jailhouse interrogation. In addition, Heidzig's interrogation at the Cass County jail
took place the following morning and in a new and distinct setting. From the record

before it, the court cannot ascertain the extent to which Heidzig's warned jailhouse statements overlapped with her initial unwarned, uncounseled admissions. However, there is also no indication in the record that the officers in this case treated the two rounds of interrogation as continuous, such as by using statements from the unwarned conversation to prompt admissions after receipt of a *Miranda* waiver. *See Seibert*, 124 S. Ct. at 2606. Given these circumstances, then, to admit Heidzig's jailhouse statements would not endorse a rule that would permit an "end run around *Miranda.*" *United States v. Carter*, 884 F.2d 368, 373 (8th Cir.1989) (discussing situation in which officers obtained unwarned admissions from suspect and obtained identical warned handwritten admissions immediately thereafter). Given the totality of the circumstances, the court finds that a reasonable person in defendant Heidzig's position could have understood the *Miranda* warnings to convey a message that she retained a choice about continuing to talk, thus the post-*Miranda* statements shall not be suppressed. The principals and goals underlying the Fifth Amendment proscription against use of compelled testimony are satisfied in the circumstances of this case by barring use of defendant Heidzig's unwarned statement in the government's case-in-chief. Therefore, this objection is also denied.

### 7. *Expectation of privacy in patrol car*

Defendants finally object to Judge Zoss's conclusion that: "Nothing prohibited Deputy McLaren from recording this conversation in his patrol car." Amended Report and Recommendation at 10. Defendants argue that defendant Heidzig had a reasonable expectation of privacy while seated in Deputy McLaren's patrol car. This issue has been squarely addressed by the Eighth Circuit Court of Appeals in *United States v. Clark*, 22 F.3d 799, 802 (8th Cir. 1994). In *Clark*, the court of appeals held, in an almost identical situation, that "a person does not have a reasonable or legitimate expectation of privacy in statements made to a companion while seated in a police car." *Id.* Other federal courts

have joined the Eighth Circuit Court of Appeals in concluding there is no reasonable expectation of privacy in a patrol car. *See also United States v. Turner*, 269 F.3d 1198, 1200 (4th Cir.), *cert. denied*, 531 U.S. 887 (2000); *United States v. McKinnon*, 985 F.2d 525, 527-28 (11th Cir.), *cert. denied,* 510 U.S. 843 (1993). The Eighth Circuit Court of Appeals's decision in *Clark* is binding precedent which this court is obligated to follow here. *See United States v. Hood*, 342 F.3d 861, 863 (8th Cir. 2003), *cert. denied*, 540 U.S. 1163 (2004). Therefore, this objection is also denied.

### III.  CONCLUSION

Therefore, for the reasons set forth above, the court, upon a *de novo* review of the record, accepts Judge Zoss's Amended Report and Recommendation and **denies** defendant Johnson's and defendant Heidzig's joint motion to suppress.

**IT IS SO ORDERED.**

**DATED** this 20th day of October, 2005.

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA